IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILLIAM D. HERNDON,

        Plaintiff,

vs.                                                                  No. CIV 05-861 LCS

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion to Reverse and Remand Administrative Agency Decision [Docket #8], filed December 16, 2005.  The Commissioner of Social Security issued a final decision denying Plaintiff's applications for supplemental security income and disability insurance benefits.  This matter comes before this Court pursuant to 28 U.S.C. § 636(c).  The United States Magistrate Judge, having considered the Motion, briefs, administrative record, and being otherwise fully advised, finds that this Motion is well-taken and should be GRANTED.

I.      STANDARD OF REVIEW

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied the correct legal standards. *Hamilton v. Sec'y of Health and Human Svcs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992).  Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such relevant evidence as a reasonable mind might accept to support the conclusion.  *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).  The decision of an Administrative Law Judge

("ALJ") is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *Id.* at 805.

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of at least twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).  The Secretary has established a five-step process for evaluating a disability claim. *Bowen v. Yuckert*, 482 U.S. 137 (1987).  At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, that he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpart P, App. 1.  Alternatively, he may show he is unable to perform work he had done in the past.  20 C.F.R. §§ 404.1520 and 416.920.  *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988).  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience.  *See Gibson v. Bowen*, 838 F.2d 442, 448 (10th Cir. 1988).

## II.    PROCEDURAL HISTORY

Plaintiff, now 54 years old, filed his application for disability insurance benefits and supplemental security income on August 1, 2002 [R. at 51-53; 284-86], alleging disability commencing on April 10, 2002.  Plaintiff's alleged disability is due to rheumatoid arthritis,

degenerative disease of the shoulder, and depression.  [R. at 65, 202]  Mr. Herndon has a high

school education and past relevant work as a utility worker for a bus manufacturer.  [R. at 66]

Mr. Herndon's initial application for supplemental security income and disability insurance

benefits was denied on February 14, 2003.  [R. at 29-34]  Plaintiff filed a Request for

Reconsideration on June 7, 2003 [R. at 35-36] and retained attorney E.C. (Mike) Gomez in July,

2003.  [R. at 25]  Following denial of this request, Plaintiff sought review by an Administrative

Law Judge ("ALJ") [R. at 43-44] and a hearing was held on January 3, 2005.  [R. at 294]

The ALJ issued his decision on February 24, 2005 [R. at 10-19], denying Mr. Herndon's

application and analyzing his claim in accordance with the sequential evaluation procedure set

forth in 20 C.F.R. § 404.1520(a)-(f).  At step one of the evaluation, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since the alleged onset of his disability.  [R. at 14]

At the second step, the ALJ found that Mr. Herndon had a physical impairment considered

'severe' based on the requirements of 20 C.F.R. § 404.1520(b).  [R. at 15]  The ALJ determined

that Plaintiff's mental impairment did not qualify as a 'severe' impairment.  Id.  The ALJ further

found that Plaintiff's impairments did not meet or equal any of the impairments found in the

Listing of Impairments ("Listings"), Appendix I, Subpart P, 20 C.F.R. §§ 404.1501-1599.  Id.

The ALJ also found Plaintiff was not fully credible regarding the extent of his limitations.  [R. at

18]

At step four, the ALJ found that claimant was unable to perform his past relevant work,

but that he retained the Residual Functional Capacity ("RFC") to perform light work.  [R. at 17]

At step five the ALJ determined that, despite his limitations, Mr. Herndon would be able to

perform work existing in significant numbers in the national economy and that therefore, he had

not been under a disability, as defined in the Social Security Act, at any time during the period

under review.  Id.

Mr. Herndon petitioned the Appeals Council for review of the ALJ's decision and this

petition was denied on June 23, 2006 [R. at 5-7], rendering the ALJ's decision the final decision

of the Commissioner.

## III.    DISCUSSION

The medical records in this case date from June, 2001, at which time Claimant underwent

an MRI of the right shoulder due to chronic pain.  [R. at 134]  Dr. Robert Hurley observed no

evidence of rotator cuff tear or focal bony lesions, although the study did indicate a collection of

fluid in the posterior soft tissue.  Id.  The clinical significance of this finding was unknown.  Id.

Studies of the left hand and wrist performed in December, 2001 revealed moderate degenerative

changes in the first metacarpal articulation with joint space narrowing, subchondral cystic, and

sclerotic changes.  [R. at 133]  There was no evidence of fracture or dislocation.  Id.

The record reveals that in December, 2001, Mr. Herndon began a program of

rehabilitation due to his complaints of right shoulder pain.  [R. at 146-149]  At the initial

evaluation, Dr. Anthony Reeve believed claimant's symptoms to be the result of rotator strain and

tendinitis.  [R. at 148]  Dr. Reeve felt Mr. Herndon's pain was causally related to work, but noted

the patient had already returned to his regular duties.  Id.  Mr. Herndon was given a subacromial

cortisone injection as well as prescriptions for Mobic[1] and Tylenol No. 3.[2]  [R. at 149]  Claimant's

---

[1]Meloxicam is used to treat arthritis.  It reduces pain, swelling, and stiffness of the joints.  Meloxicam is
known as a nonsteroidal anti-inflammatory drug (NSAID).  http://www.webmd.com/drugs/drug-18173-Mobic

[2]Tylenol No. 3, a combination of acetaminophen and codeine is indicated for the relief of mild to
moderately severe pain.  Each tablet contains 300mg Acetaminophen and 30mg Codeine Phosphate.  Tylenol No. 4
is also a combination of acetaminophen and codeine containing 300 mg Acetaminophen and 60mg Codeine

anticipated impairment rating was, at this time, undetermined. [R. at 148]

Mr. Herndon continued to follow up with Dr. Reeve through June of 2002. During this time, Plaintiff was prescribed a variety of medications including Tylenol No. 3, Tylenol No. 4, Medrol[3], Vioxx[4], and Bextra[5]. [R. at 141-145] Mr. Herndon initially improved on this course of treatment [R. at 144], but later experienced continued pain and limited range of motion. [R. at 141-142] A surgical consult and/or arthroscopic procedure was suggested. [R. at 145]

In March, 2002, Mr. Herndon visited Dr. Thomas Ramage for pain symptoms with recent onset. [R. at 167-76] Plaintiff had presented at Eastern New Mexico Medical Center earlier in the month, chiefly complaining of shoulder and wrist pain. [R. at 135-138] Dr. Ramage's impression was of recent-onset rheumatoid arthritis ("RA"). [R. at 167] Claimant's arthritis was described as "one of the most acute cases of rheumatoid that I have seen in some time." [R. at 168] Active synovitis was found in the wrist joints as well as in the knees, elbows and metatarsals. Id. It was noted that Mr. Herndon had difficulty flexing his knees and inflammatory-appearing fluid was tapped from both knees. Id. In addition, Mr. Herndon was felt to be anemic. Id. Dr. Ramage discussed claimant's drinking and how this behavior might affect the treatment of

---

Phosphate. *Physicians Desk Reference*, 2216 (54th ed. 2000).

[3]Methylprednisolone is used to treat various conditions such as allergic disorders and arthritis. It decreases the body's immune response to these diseases and reduces symptoms such as swelling and redness. Methylprednisolone is a corticosteroid hormone. http://www.webmd.com/drugs/drug-11321-Medrol.

[4]Vioxx is indicated for relief of the signs and symptoms of osteoarthritis. Vioxx is classified as an NSAID. *PDR*, 1913.

[5]Bextra is classified as an NSAID and is used to treat both osteoarthritis and rheumatoid arthritis. Bextra is no longer available in the United States. http://www.webmd.com/drugs/mono-5289-VALDECOXIB+10MG.

his RA.  Id.  Mr. Herndon was prescribed prednisone[6] with methotrexate[7] and Dr. Ramage

advised him to take three months off work.  [R. at 168]

When Mr. Herndon again visited Dr. Ramage in May, 2002, he had undergone substantial

improvement in both his RA and his anemia.  [R. at 164]  Dr. Ramage commented that the

improvement in Mr. Herndon's condition had been "amazing."  Id.  However, by July, 2002,

Plaintiff was again experiencing severe difficulties although he indicated he was taking his

medications.  [R. at 160]  Dr. Ramage increased Plaintiff's methotrexate and indicated that his

hands and feet were inflamed and advised Plaintiff not to return to work but to apply for disability

benefits.  Id.  He further indicated that Mr. Herndon was "not very coherent" and that his mental

status was a possible concern.  Id.

As of November, 2002 Mr. Herndon's condition had again improved dramatically.  [R. at

157]  Plaintiff denied any acute problems at the time and Dr. Ramage felt he had achieved

remission of his RA.  Id.  Dr. Ramage remained concerned about the numerous long-term, high-

risk medications that Plaintiff was taking and discussed possible drug toxicity with the patient.  Id.

Dr. Ramage also noted that Plaintiff was behaving strangely and indicated a concern about

behavioral or other mental problems, possibly including schizophrenia.  Id.  Dr. Ramage reiterated

his conclusion that Plaintiff was unable to work.  Id.

During the next several months, Mr. Herndon saw Dr. Ramage on several more occasions

and continued to improve.  [R. at 151, 154]  In May, 2003, Dr. Ramage stated that Mr. Herndon

---

[6]Prednisone is a corticosteroid hormone (glucocorticoid), which decreases the immune system's response to various diseases to reduce symptoms such as swelling and allergic-type reactions. http://www.webmd.com/drugs/mono-9383=PREDNISONE+-+ORAL.

[7]Methotrexate is used to control rheumatoid arthritis.  The medication works by suppressing the immune system.  http://www.webmd.com/drugs/drug-64890-Methotrexate.

had stopped taking his medications for several months and that his symptoms had not returned. [R. at 151]  He advised Plaintiff to stay off the methotrexate for an additional two months and to return at that time.  Id.

In October, 2003, Mr. Herndon returned to Dr. Ramage for consultation.  [R. at 208]  At that time his symptoms were beginning to worsen and Dr. Ramage suggested Plaintiff restart the methotrexate.  Id.  Mr. Herndon apparently declined this treatment, although he was still taking a daily dose of prednisone.  Id.  Dr. Ramage additionally commented on Mr. Herndon's mental state, which he described as "definitely not normal."  Id.  Dr. Ramage observed a lack of social skills and indicated a concern about schizophrenia.  Id.  He further indicated he was surprised Plaintiff had previously been able to maintain steady employment given his apparent psychological problems.  Id.

In July, 2003, Mr. Herndon's pastor, Eileen Utton completed a third-party function report on his behalf.  [R. at 109-117]  Ms. Utton indicated that, while pain was a problem for the claimant, she felt his mental problems were of greater concern.  Id.  She stated that Mr. Herndon needed encouragement in maintaining basic standards of cleanliness [R. at 111] and that he had difficulty maintaining concentration or holding a conversation with another person.  [R. at 112-113]  Ms. Utton described Plaintiff as "emotionally like a 12 year-old boy" and felt his social interaction was inappropriate.  [R. at 116]  She related that Mr. Herndon displayed strange behaviors such as "carr[ying] knives on him at all times."  [R. at 115]

During this period, Plaintiff was also seeking professional care for his mental difficulties. At his initial evaluation in November, 2002, Mr. Herndon indicated to Dr. John Draper problems with serious depression and anxiety, as well as trouble understanding, concentrating, or

7

remembering. [R. at 203] Plaintiff was believed to be of average intelligence and was diagnosed

with an adjustment disorder at that time. [R. at 205] Individual therapy was recommended. [R.

at 192] Dr. Draper rated Plaintiff's GAF score at 52.[8] Id. Mr. Herndon apparently visited Dr.

Draper on several occasions during the next few months. [R. at 178-184] The record is unclear

as to the results of these sessions, although Plaintiff's GAF score in May, 2003 was felt to be at

48.[9] [R. at 183]

A psychiatric review technique completed in December, 2003 revealed non-severe medical

impairments coexisting with affective disorder, anxiety disorder, and substance-addiction disorder.

[R. at 217-229] Plaintiff was felt to be mildly limited in activities of daily living, in maintaining

social functioning and in maintaining concentration, persistence, or pace. [R. at 227] A

concurrent physical evaluation revealed no apparent exertional limitations with adherence to the

prescribed treatments. [R. at 216]

During 2004, Mr. Herndon began seeking treatment at La Casa Family Health Center in

Roswell, NM. [R. at 262-283] The overall quality of these records is somewhat poor, but it

seems Plaintiff was largely seeking treatment for continued arthritic pain and swelling. Id. It

appears that a number of claimant's lab reports, particularly hematology reports, were abnormal

---

[8]GAF refers to "Global Assessment of Functioning". The GAF scale is used to assess an individual's overall level of functioning. This information is useful in planning treatment, measuring its impact, and predicting outcome. The GAF scale is divided into 10 ranges of functioning. Determining a GAF rating involves making a subjective choice of a single value that best reflects the individual's overall level of functioning. A GAF of 52 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Diagnostic and Statistical Manual of Mental Disorders*, 32, 34 (4th ed. 2000) [DSM-IV].

[9]A GAF score of 48 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV, 34.

during this period.  [R. at 267, 271, 275, 280]  However, as the record lacks any analysis of these results, I cannot conclude the extent to which they are indicative of a physical impairment.

## IV.    ANALYSIS

Plaintiff raises several allegations of error in his Motion to Remand.  I agree with Mr. Herndon's contention that the ALJ erred in evaluating his mental impairments.  Additionally, I believe the ALJ erred in his consideration of Plaintiff's age and of what effect, if any, that factor should have on a determination of disability.  Due to these errors, I believe the determination of RFC was also in error.

### Analysis of Mental Impairments

### a.    Duty to Consider all Evidence

The ALJ determined that the evidence of record did not establish that Plaintiff's mental impairments constituted 'severe' impairments.  [R. at 15]  I find that this conclusion is suspect for two reasons.  First, it is not clear the ALJ considered all the evidence in the record.  Second, I believe the nature of the evidence before the ALJ triggered his duty to further develop the record regarding Plaintiff's mental impairments.

It is well-established in the Tenth Circuit that an ALJ is not required to discuss every piece of evidence in the record.  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  At the same time, the record must demonstrate that the ALJ considered all the evidence.  *Id.*  Further, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon as well as significantly probative evidence he rejects.  *Id.* at 1010 (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) ("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which

considerable evidence is presented to counter the agency's position")).

The ALJ determined that, while Mr. Herndon had experienced symptoms of "depressed mood and mild anxiety" [R. at 15], these symptoms had markedly decreased after Plaintiff stopped drinking and that Mr. Herndon was only mildly limited in his activities of daily living. Id. The ALJ further noted that there was no indication of significant socialization problems or an inability to function in a self-sufficient manner. Id. However, a number of other records existed which the ALJ chose not to discuss. These included Dr. Draper's rating of Plaintiff's GAF score at 52 on one occasion and at 48 on another [R. at 183, 192], Eileen Utton's reports of difficulties in maintaining social functioning, [R. at 111-116] and Dr. Ramage's reports of behavioral anomalies and concerns about schizophrenia. [R. at 157, 208] It is not clear that the ALJ considered this evidence, which necessitates remand of this matter to the Commissioner. *See Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) ("The ALJ is charged with carefully considering all the relevant evidence and linking his findings with specific evidence . . . A bare conclusion is beyond meaningful judicial review").

### b.    Duty to Develop Record

I also believe the ALJ had a duty to further develop the record with regard to Mr. Herndon's alleged mental problems. To be sure, the Commissioner has broad latitude in ordering consultative examinations, *see Diaz v. Sec'y of Health & Human Svcs.*, 898 F.2d 774, 778 (10th Cir. 1990), and the ALJ's duty to conduct factfinding is lessened when a claimant is represented by counsel. *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997). However, the Tenth Circuit has explicitly held that, where the medical evidence in the record is inconclusive, *see Thompson*, 987 F.2d at 1491, or where additional tests are required to explain a diagnosis already

in the record, a consultative examination will often be required for the proper resolution of a disability claim. *Hawkins*, 113 F.3d at 1166; *see also* 20 C.F.R. § 404.1519a(b)(1).

As already discussed, there are indications in the record from Plaintiff's treating physicians and from third parties that Plaintiff suffers from some type of mental impairment that may seriously impair his ability to function in society. Upon remand, following consideration of all the evidence, I recommend a consultative examination be procured due to the inconclusive nature of the current record.

### Analysis of Plaintiff's Age

While Plaintiff does not raise the issue in his brief, I believe the matter must also be remanded for a determination of what effect Plaintiff's age should have on a determination of disability. The Commissioner faces a more stringent burden when denying disability benefits to older claimants. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). In assessing disability in older individuals, the Commissioner should keep in mind that acquisition of skills that are transferable to other work will give a claimant "a special advantage over unskilled workers in the labor market." *Id.*; SSR 82-41 WL 31389 at *2 (1982). The ALJ may find that a younger claimant with a high school education is not disabled, even if that claimant can only perform unskilled work. *Id.*; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.21. However, to find the same claimant not disabled when he is closely approaching advanced age, the ALJ must also find that the claimant acquired skills in his past work that are transferable to other skilled or semi-skilled jobs. *Id.*; §§ 201.14, 201.15.[10]

---

[10]*See also* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(c); "[F]or individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within

The ALJ did make brief note of Plaintiff's age in his opinion stating, "[T]he claimant is currently fifty-three years old.  This is defined in the regulations as an individual 'closely approaching advanced age'. . . he has a high school education and has no transferable skills from the essentially unskilled work he has performed in the past . . . the existence of occupations in the national economy is met by administrative notice."  [R. at 17]  Despite this apparent "notice" of Plaintiff's age, the record does not contain an analysis of the effect age may have on Mr. Herndon's ability to procure and sustain substantial gainful employment within the meaning of *Dikeman* and the Code of Federal Regulations.  Because I do not believe the ALJ completed the proper analysis of the effect of Plaintiff's age, I believe remand of this matter to the Commissioner is appropriate for a more thorough evaluation of this issue.

**Analysis of Residual Functional Capacity**

Because I believe the ALJ erred in evaluating Mr. Herndon's mental impairments and age, I cannot properly evaluate the conclusion that Plaintiff retained the RFC to perform light work. On remand, I leave the issue of RFC to the ALJ following a thorough analysis of Plaintiff's mental state and age.

**V.     CONCLUSION**

Upon review of the evidence presented on this Motion to Reverse and Remand Administrative Agency Decision, the Court has determined that the Commissioner's decision should be remanded for further consideration of Plaintiff's alleged mental impairments and for

---

the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by a functional restriction to light work warrant a finding of disabled.  Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education."

consideration of what effect, if any, Plaintiff's age should have on the ALJ's disability

determination.  Accordingly, Plaintiff's Motion to Reverse and Remand is **GRANTED.**

  **A JUDGMENT CONSISTENT WITH THIS OPINION SHALL ISSUE.**

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**